# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| **v.** | ) | |
| | ) | **NO. 1:10-CR-521-TCB-AJB-02** |
| **OTIS HENRY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## UNITED STATES MAGISTRATE JUDGE'S ORDER AND
## NON-FINAL REPORT AND RECOMMENDATION

Defendant Otis Henry seeks to suppress from his trial evidence seized from a residence in Chamblee, Georgia, and a motel room in Tampa, Florida, [Docs. 508, 513 and 521], his post-arrest statements, [Doc. 507], and identification testimony, [Doc. 509, 552, 573]. The Court held an evidentiary hearing, [Doc. 587 (hereinafter "T_"], after which the parties filed briefs. [Docs. 615, 671 (Henry); 629 (Govt.)]. For the reasons that follow, the undersigned **RECOMMENDS** that the motions to suppress evidence from 1855 8th Street, Chamblee, Georgia, [Docs. 513, 521], and identifications, [Docs. 509, 552, and 573], be **DENIED**; the motion to suppress statements, [Doc. 507], be **GRANTED IN PART AND DENIED IN PART**; and the motion to suppress evidence, [Doc. 508], be **DENIED IN PART AND HELD IN**

**ABEYANCE IN PART**, pending the filing of additional briefs on the voluntariness of Defendant's consent to search Room 125 of the Wingate Inn, as directed below.

## I.    *Motions to suppress evidence from search by warrant of 1855 8th Street, Chamblee, Georgia*

Henry seeks to suppress the fruits of a State search warrant executed at this address on October 1, 2010. However, the Court need not reach the merits of his arguments because he did not establish that he had a legitimate expectation of privacy in the premises searched.

To challenge a seizure as violating the Fourth Amendment, a defendant must have "standing,"[1] *i.e.*, a legitimate expectation of privacy in the premises. *See United States v. Gonzalez*, 940 F.2d 1413, 1420 n.8 (11th Cir. 1991). As a result, the Fourth Amendment protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion. *See Katz v. United States*, 389 U.S. 347, 353 (1967). Fourth Amendment rights are personal, and only

---

[1]      The undersigned recognizes that the Supreme Court disapproves of the use of the word "standing." *See Rakas v. Illinois*, 439 U.S. 128, 139-40 (1978); *see also United States v. Hawkins*, 681 F.2d 1343, 1344-45 (11th Cir. 1982). However, the undersigned will use the word "standing" when referring to whether the defendant has an expectation of privacy because the parties have used this term and courts routinely use "standing" as "shorthand for the existence of a privacy or possessory interest sufficient to assert a Fourth Amendment claim." *United States v. Daniel*, 982 F.2d 146, 149 n.2 (5th Cir. 1993).

individuals who actually enjoy the reasonable expectation of privacy may challenge the validity of a government search. *Rakas v. Illinois*, 439 U.S. 128, 133-34, 143 (1978); *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000). One's standing to challenge governmental actions on Fourth Amendment grounds is a threshold question. *United States v. McBean*, 861 F.2d 1570, 1573 (11th Cir. 1988). The defendant bears the burden of showing a legitimate expectation of privacy in the area searched. *United States v. Harris*, 526 F.3d 1334, 1338 (11th Cir. 2008); *United States v. Brazel*, 102 F.3d 1120, 1147 (11th Cir. 1997).

An individual has standing to challenge a search if "(1) he has a subjective expectation of privacy, and (2) society is prepared to recognize that expectation as objectively reasonable." *Harris*, 526 F.3d at 1338. That is, a defendant must establish both a subjective and an objective expectation of privacy. *United States v. Segura-Baltazar*, 448 F.3d 1281, 1286 (11th Cir. 2006); *United States v. Robinson*, 62 F.3d 1325, 1328 (11th Cir. 1995). The subjective prong is a factual inquiry, *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987), *United States v. Jones*, 184 Fed. Appx. 943, 947 (11th Cir. June 22, 2006); and "requires that a person exhibit an actual expectation of privacy." *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (quoting *Segura-Baltazar*, 448 F.3d at 1286). The objective prong is a question

3

of law, *McKennon*, 814 F.2d at 1543, and "requires that the privacy expectation be one that society is prepared to recognize as reasonable." *King*, 509 F.3d at 1341 (quoting *Segura-Baltazar*, 448 F.3d at 1286).

Courts assess on a case-by-case basis the "standing" of a particular person to challenge an intrusion by government officials into an area over which that person lacked primary control. *Oliver v. United States,* 466 U.S. 170, 191 n.13 (1984). No one circumstance is talismanic to this inquiry. *United States v. Haydel*, 649 F.2d 1152, 1154 (5ᵗʰ Cir. Unit A Jul. 8, 1981)[2]; *see also Rakas*, 439 U.S. at 152 (stating that the legitimacy of one's privacy claim is determined by totality of the circumstances) (Powell, J., concurring). "While property ownership is clearly a factor to be considered in determining whether an individual's Fourth Amendment rights have been violated, property rights are neither the beginning nor the end of . . . [the] inquiry." *United States v. Salvucci*, 448 U.S. 83, 92 (1980) (citation omitted). Other factors to be weighed include whether the defendant has a possessory interest in the thing seized or the place searched, whether he has the right to exclude others from that

---

[2]     The Eleventh Circuit has adopted as binding precedent decisions of the Fifth Circuit, including Unit A panel decisions of that circuit, rendered prior to October 1, 1981. *See United States v. Todd*, 108 F.3d 1329, 1333 n.5 (11ᵗʰ Cir. 1997); *Limelight Productions, Inc., v. Limelite Studios, Inc.*, 60 F.3d 767, 769 n.1 (11ᵗʰ Cir. 1995).

place, whether he has exhibited a subjective expectation that it would remain free from governmental invasion, whether he took normal precautions to maintain his privacy and whether he was legitimately on the premises. *United States v. Pitt*, 717 F.2d 1334, 1337 (11th Cir. 1983); *Haydel*, 649 F.2d at 1154-55. "The essence of this inquiry is whether the defendant has 'demonstrate[d] a significant and current interest' in the property at the time it was searched." *United States v. Bushay*, 859 F. Supp. 2d 1335, 1350 (N.D. Ga. 2012) (Batten, J.) (quoting *United States v. Garcia*, 741 F.2d 363, 366 (11th Cir.1984)). To have an expectation of privacy in premises that he did not own or lease, a defendant must show " 'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.' " *Id.* (quoting *United States v. Baron-Mantilla*, 743 F.2d 868, 870 (11th Cir. 1984)); *see also United States v. Chaves*, 169 F.3d 687, 690-91 (11th Cir. 1999) (same); *United States v. Bachner*, 706 F.2d 1121, 1126 n.6 (11th Cir. 1983) (same); *Garcia*, 741 F.2d at 366 (stating that although defendant had more than tenuous interest in searched apartment, he had no standing where connections were not regular or personal enough to find that appellant adopted apartment as a place of business or as a residence). *Compare United States v. Torres*, 705 F.2d 1287, 1294-95 (11th Cir. 1983), *vacated en banc, consideration pending*

5

*remand to panel*, 718 F.2d 998 (11ᵗʰ Cir. 1983), *remanded*, 720 F.2d 1506 (11ᵗʰ Cir. 1983), *on appeal after remand*, 741 F.2d 1323 (11ᵗʰ Cir. 1984) (where defendants were house guests of searched house, ate, slept and showered there, stored personal belongings there and were the only guests in house at time of search, standing to challenge search existed).

While the Eleventh Circuit has allowed a defendant to rely on testimony or an inventory prepared by the government identifying property as belonging to the defendant, *United States v. Eyster*, 948 F.2d 1196, 1209 (11ᵗʰ Cr. 1991),[3] a defendant may not establish standing by relying on the government's theory of the case. *United States v. Singleton*, 987 F.2d 1444, 1449 (9ᵗʰ Cir. 1993); *United States v. McNeal*, 82 F. Supp. 2d 945, 950 (S.D. Ind. 2000); *see also United States v. Thompson*, 171 Fed. Appx. 823, 828 (11ᵗʰ Cir. Mar. 27, 2006) (concluding that motion to suppress

---

[3]    The undersigned notes that the Seventh Circuit provides a defendant less leeway. That court has held that a defendant may not establish a subjective expectation of privacy by relying on facts in a search warrant affidavit or testimony from a government witness because "without an affidavit or testimony from the defendant it is almost impossible to find a privacy interest because this interest depends, in part, on the defendant's subjective intent and his actions that manifest that intent." *See United States v. Ruth*, 65 F.3d 599, 604-05 (7ᵗʰ Cir. 1995). The Eleventh Circuit, on the other hand, has suggested that under proper circumstances, a warrant affidavit might provide evidence of standing. *See United States v. Thompson*, 171 Fed. Appx. 823, 828 (11ᵗʰ Cir. Mar. 27, 2006) (indicating under circumstances of the case that warrant affidavit did not establish standing).

6

relying on government contention that room was rented by defendant was insufficient to demonstrate standing to warrant an evidentiary hearing); *United States v. Henry*, No. 1:09-cr-522-1-TCB-GGB, 2010 WL 5559207, *4 (N.D. Ga. Dec. 7, 2010) (R&R *adopted by* 2011 WL 65762 (N.D. Ga. Jan. 7, 2011)) ("The Government correctly contends that Defendant cannot show standing simply through the contentions of Government agents or the theory of the Government's case.") (citing *United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995)). Also, a defendant cannot rely on general or conclusory assertions to establish standing. *United States v. Cooper*, 203 F.3d 1279, 1284 (11th Cir. 2000); *see also United States v. Mendoza*, 438 F.3d 792, 795 (7th Cir. 2006) (holding that offer of conclusory statements was insufficient to establish standing; *United States v. Silouangkhoth*, No. 2:10-cr-821, 2011 WL 1549427, *2 (D. Utah Apr. 21, 2011) (finding that defendant did not establish standing where he made "a conclusory allegation that he has [ ] an interest in, or control over, the property").

At the hearing, Henry introduced the following evidence in an attempt to satisfy his burden to establish a legitimate expectation of privacy. In executing the warrant, law enforcement located a framed photograph of Defendant on display, as well as other photographs of Henry along with Sara Scott, his girlfriend and the lessee of the

7

premises.  T17, 18; Def. Exs. 6-8.  A closet contained many items of male clothing that the agents believed was Henry's.  T19-21; Def. Ex. 12.  An SUV that contained bills of sale to and from "Wesley Johnson," one of Henry's aliases, was parked in the garage.  T14-15, 23, 26, 27-28, 85-86; Govt. Ex. 7.[4]  A neighbor stated that she had seen Henry at that location "overnight a couple of times."  T30; *see also* T37-38, 40.  Also, the search warrant detailed that the day before the execution of the warrant, law enforcement believed that Henry orchestrated a drug transaction from the premises.  [Doc. 615 at 10-11 (citing Def. Ex. 16)].  Police believed he was connected to that location.  T100.  Moreover, an effort had been made to hide the controlled substances in the location, because the drugs that were located when the search warrant was executed were secreted throughout the residence, including in the wall insulation.  T101-02.

---

[4]    Specifically, the SUV contained a bill of sale dated May 20, 2010, to "Wesley Johnson," and another dated June 21, 2010, from "Wesley Johnson" to "Paul C. Hue."  Govt. Ex. 7, item N-69.  Hue was the owner of Nguyen Motor Sports.  T113.  Thus, at the time of the search, the ownership of the SUV appears to have been transferred to someone other than Henry.

[5]    While the warrant was being executed, a sister of Defendant's girlfriend arrived driving a vehicle she claimed "had belonged" to Defendant.  T80.  At the time the sister arrived in the vehicle, the vehicle was registered in the name of Patrick McKen.  T113.

AO 72A
(Rev.8/82)

However, the residence was leased to Henry's girlfriend, Sara Scott, T28, and the gas and cable service bills were in her name. *Id.* Located in the SUV were paycheck stubs, financial and medical records, and court documents in Scott's name. T84-85. No documents were located in the residence or SUV in the name of "Otis Henry." T85.[6]

None of these facts, singularly or in combination, "shows 'an unrestricted right of occupancy or custody and control of the premises as distinguished from occasional presence on the premises as a mere guest or invitee.' " *United States v. Campbell*, 434 Fed. Appx. 805, 810 (11th Cir. July 13, 2011) (quoting *Baron-Mantilla*, 743 F.2d at 870). Moreover, Henry's drug dealing on the premises (and hiding the drugs in the walls and elsewhere) does not serve to establish a legitimate expectation of privacy in the premises. *Cooper*, 203 F.3d at 1285 n.3 (stating that "to establish a reasonable expectation of privacy in a third-party's home, an individual must demonstrate [he] is a guest on the premises for a personal occasion, rather than for strictly a commercial purpose"); *United States v. Rivera-Pabon*, No. 11-11661, 2012 WL 4936571, at *1 (11th Cir. Oct. 18, 2012) (guest who used house to prepare and package cocaine had

---

[6]     None of the witnesses and cooperating sources shown a photograph of 1855 8th Street identified it as Henry's residence. T115.

lower expectation of privacy); *see also United States v. Bell*, 218 Fed. Appx. 885, 895 (11ᵗʰ Cir. Feb. 13, 2007) (holding that in order to establish reasonable expectation of privacy, defendant would have to prove that he was a guest for personal reasons and not a commercial purpose) (citing *Minnesota v. Carter*, 525 U.S. 83, 90-91 (1998)); *United States v. Sarda-Villa*, 760 F.2d 1232, 1236-37 (11ᵗʰ Cir. 1985) (holding that drug smugglers could not assert standing solely on the basis that they hid the drugs well and hoped no one would find them, and stating that "we are not willing to say that society is prepared to recognize a justifiable expectation of privacy solely on the basis of appellants' efforts to secret the contraband").  Further, Henry's reliance on the government's theory of the case – that he stored drugs at his girlfriend's residence – is, as has been discussed, an improper basis upon which to claim standing.

The facts of this case are different than those in *United States v. Pollard*, 215 F.3d 643 (6ᵗʰ Cir. 2000).  In *Pollard*, the court held that the defendant had a reasonable expectation of privacy in another's residence, because the evidence showed that "[h]e had been friends for approximately seven years with the lessee . . . and had been staying in the home earlier in the week," "occasionally spent the night at the residence and kept some personal belongings in a closet in the living room," and "was allowed to stay in the home even if the residents were not present." *Pollard*, 215 F.3d

at 647, 648.  The record in the present case also compares unfavorably to that in *United States v. Jenkins*, 285 F. Supp. 2d 999, 1006 (S.D. Ohio 2003), *rev'd on other grounds* 396 F.3d 751 (6th Cir. 2005), where the defendant was held to have standing to challenge the search of his girlfriend's house, where the girlfriend testified that the defendant (1) was her boyfriend for four years, and at the time of the search was living there, as he had for the past two years; (2) slept there approximately five nights per week; (3) kept clothes and personal effects and occasionally received mail there; and (4) had full access to the residence.  She also testified that she was unaware of any other place he had to stay.

Thus, Henry has not satisfied his burden to show that he had a legitimate expectation of privacy in Sara Scott's residence.  In the event the District Judge disagrees with the undersigned's conclusion that Henry lacked a legitimate expectation of privacy in the searched premises, following is a discussion of Henry's challenges to the warrant, which challenges the Court also recommends should be rejected.

First, the warrant is not invalidated and the evidence seized is not subject to suppression by the affiant's failure to sign the supporting affidavit until almost six weeks after the search, where prior to the search the affiant was sworn by the issuing judge at the time the warrant was issued.  *See* T149-52; Def. Ex. 17 at 12.  Even if

11

facially invalid, the good faith exception to the exclusionary rule, *United States v. Leon*, 468 U.S. 897, 913 (1984), saves the fruits of the search from suppression, because the officer's error was inadvertent and the issuing judge, having found probable cause, issued the warrant. *Massachusetts v. Sheppard*, 468 U.S. 981 (1984) (applying good-faith exception to technical deficiency in warrant); *see United States v. Taxacher*, 902 F.2d 867, 871 (11th Cir. 1990) ("[T]he officer's reliance on the [judge's] probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable." (quoting *Leon*, 468 U.S. at 922) (emphasis omitted)). *Cf. United States v. Hessman*, 369 F.3d 1016, 1021, 1023 (8th Cir. 2004) (concluding that officer's good faith reliance on a warrant was objectively reasonable, even though the officer had failed to sign his affidavit and the magistrate had failed to administer an oath, noting that "(1) the state magistrate had made a probable cause determination, (2) the affidavit provided specific information about the objects of the search, (3) the affiant . . . helped execute the warrant, and (4) the warrant could have been made valid by the addition of [the affiant's] signature and administration of an oath."); *see also United States v. Trost*, 152 F.3d 715, 722 (7th Cir. 1998) ("It should be clear after *United States v. Leon*, 468 U.S. 897 (1984), that technical defects in a warrant do not call for or permit exclusion of what the search produces.") (internal quotations

12

omitted); *United States v. Kelley*, 140 F.3d 596, 602-03 (5th Cir. 1998) (good faith exception to exclusionary rule applied where the magistrate judge failed to sign the search warrant because probable cause existed and the warrant was flawed only due to the inadvertence of the magistrate).

As for defects in the warrant's execution, even assuming that the State search warrant was "federal in execution," *United States v. Lehder-Rivas*, 955 F.2d 1510, 1522 (11th Cir. 1992); *United States v. Chastain*, 387 Fed. Appx. 914, 1915-16 (11th Cir. July 20, 2010) (citing *Lehder-Rivas*)[7], and thus had to comply with Fed. R. Crim. P. 41's inventory and return requirements, Henry would not be entitled to suppression of the fruits of the search. Violations of Rule 41(f) "are essentially ministerial in nature and a motion to suppress should be granted only when the defendant demonstrates legal prejudice or that non-compliance with the rule was intentional or in bad faith." *United States v. Marx*, 635 F.2d 436, 441 (5th Cir. Unit B, Jan. 27, 1981)[8]; *see also United States v. Loyd*, 721 F.2d 331, 333 (11th Cir. 1983)

---

[7]     The record demonstrates that the search warrant was prepared for and executed as part of a federal investigation, and the affiant was a local law enforcement officer serving as a member of a DEA task force. T67, 129.

[8]     The Eleventh Circuit has adopted as binding all decisions issued by a Unit B panel of the former Fifth Circuit. *Stein v. Reynolds Sec., Inc.*, 667 F.2d 33, 34 (11th Cir. 1982).

("[U]nless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.") (citations omitted).  In *Marx*, the court held that failure to deliver a copy of the search warrant to the party whose premises were searched until the day after the search did not invalidate a search, in the absence of a showing of prejudice.  The *Marx* Court went on to explain that in order to show prejudice in this context, a defendant must show that because of the violation of Rule 41, he was subjected to a search that might not have occurred or would not have been so abrasive had the rule been followed. *Marx*, *id.*

The  defendant has the burden of establishing that the warrant in this case was defective or executed improperly.  *Franks v. Delaware*, 438 U.S. 154, 171 (1978); *United States v. Van Horn*, 789 F.2d 1492, 1500 (11th Cir. 1986); *Marx*, 635 F.2d at 441; *United States v. Vigo*, 413 F.2d 691, 693 (5th Cir. 1969) (defendants have the burden of proof in challenging the validity of the execution or service of the search warrant).

14

Here, Henry has not satisfied his burden of demonstrating that the search would not have occurred or would have been conducted differently if the requirements of Rule 41(f) had been followed, or that law enforcement's violations were committed in bad faith. First, a copy of the warrant, along with a handwritten inventory, was left at 1855 8th Street, so there was no violation of Rule 41(f). T73, 74. That the government lost its copy of the handwritten inventory, T96, does not alter this conclusion, as the Court finds TFO Gordon's testimony on this point to be both credible and not contradicted. Second, while the return, including the inventory, was not presented to the issuing judge until November 23, 2010, more than seven weeks after the search, the evidence demonstrates, at most, that TFO Kanupke, the affiant, was negligent due to the press of other matters involving the investigation, which included getting an accurate count of the 700,000 ecstacy pills, T136-37, 146-47, 155, and trying to locate Henry, who was a fugitive. T157. Defendant's postulating that the delay had to be the result of bad faith is not borne out by the record, nor has he shown how he was prejudiced by law enforcement's inadvertent ministerial lapses.

As a result, the Court **RECOMMENDS** that Henry's motions to suppress the fruits of the search warrant at 1855 8th Street, Chamblee, Georgia, be **DENIED** be cause

AO 72A
(Rev.8/82)

he did not have a legitimate expectation in the premises searched, or alternatively, because the defects in the warrant or its execution do not require suppression.

## II. *Motion to suppress identification testimony*

After the photograph of Henry was seized from 1855 8th Street, it was displayed to neighbors at that location, at 943 Peachtree Road (another apartment associated with Henry), and to law enforcement confidential sources of information. T37-38, 86-87. Two neighbors at 1855 8th Street were (at different times) first asked, "Do you know who lives here?" and then "Have you seen this guy?" as Gordon showed them the photograph.[9] T86-87. They both stated they had seen Henry there "a couple of times," with one of them reporting that he drove an SUV. T38-39, 40. The female witness seemed "pretty sure" of her identification. T42. The male witness stated that a female lived at that address and he had seen the male depicted in the photograph at that residence "a couple of times." T45. He appeared slightly less certain of the identification than the female witness. T46.

On December 15, 2010, law enforcement displayed the photograph to the concierge at 943 Peachtree Road. T47. The officers already had the paperwork

---

[9]     The photograph was the same photograph seized from 1855 8th Street, but taken out of the picture frame. T57.

identifying the owner of Apartment 707 (not Henry), and they knew that the owner did not reside there. T49. The concierge stated that there were too many people coming and going from that unit for him to know exactly who was residing there, and after he was shown the photograph, stated that he had seen him but did not pay too much attention and was not sure. T49-50.

The photograph also was shown to confidential sources in December 2010 and after January 2011. T51-52. CS-1 was shown the photo in law enforcement's effort to locate Henry, who was a fugitive at the time, and CS-1 had stated he knew Henry and affirmatively identified the person depicted in the photograph as "Otis." He had not given a physical description of Henry before being shown the photograph, but stated he had seen Otis numerous times. T52-53. As for CS-1's level of certainty in his identification, Gordon testified that CS-1 made the identification even before the photograph was placed down on the table before him. T53.

CS-2 identified Henry after being shown a collection of 30 photographs of persons and places relevant to the investigation. (Henry was the 17th photograph in the

exhibit). T56-57, 58 & Govt. Ex. 2.[10] The series of photographs depicted another person named Otis as well. T58. CS-2 was very certain of the identification. T60.

CS-3 and CS-4 also definitely identified "Otis" in the photograph collection. T62, 63.

The Supreme Court established the due process standard against which police identification procedures are to be measured in *Stovall v. Denno*, 388 U.S. 293 (1967). A violation of due process occurs when, under "the totality of the circumstances," a confrontation procedure is "unnecessarily suggestive and conducive to irreparable mistaken identification." *Simmons v. United States*, 390 U.S. 377, 384 (1968).

Courts employ a two-part test for determining whether an out-of-court identification can properly be admitted. First, the Court determines whether the original identification procedure was unduly suggestive. A finding of impermissible suggestiveness raises concern over the reliability of identification and triggers closer scrutiny by the Court to determine whether such a procedure created a substantial risk of misidentification. *Allen v. Estelle*, 568 F.2d 1108, 1113 (5th Cir. 1978). Claims that the circumstances of a police identification procedure are so unnecessarily suggestive

_____

[10] Again, the photograph was a copy of the same photograph seized from 1855 8th Street, but taken out of the picture frame. T57.

as to produce irreparable misidentification must be evaluated in light of the totality of the surrounding circumstances. *Nettles v. Wainwright,* 677 F.2d 410, 414 (11th Cir. 1982); *Rudd v. State of Fla.*, 477 F.2d 805, 811 (5th Cir. 1973) ("Pretrial identification procedures should not be found impermissibly suggestive on the basis of rigid application of categorical rules. For example, indicia of reliability such as a witness' strong recollection from an independent, untainted source may in some cases counteract the suggestiveness in certain identification procedures. Also, exigencies of efficient police work may occasionally justify identification procedures that in other contexts would be unnecessarily suggestive. Because of these and other variables spanning the range of human experience, courts have wisely counseled against determination of constitutionally impermissible suggestiveness on other than a case-by-case basis.").

If the procedures utilized were unduly suggestive, the Court then considers whether, under the totality of the circumstances, "the identification was nonetheless reliable." *United States v. Brown*, 441 F.3d 1330, 1350 (11th Cir. 2006) (citing *United States v. Diaz*, 248 F.3d 1065, 1102 (11th Cir. 2001)). The factors that go into this "totality of the circumstances" test include the opportunity to view, the degree of attention, the accuracy of the description, the level of certainty, and the length of time

19

elapsing between the crime and the identification. *Blanco v. Singletary*, 943 F.2d 1477, 1508 (11th Cir. 1991) (footnote omitted).

The defendant has the burden of showing that the eyewitness identification was derived through "impermissibly suggestive" means. *Perry v. New Hampshire*, 132 S. Ct. 716, 733 (2012); *Simmons*, 390 U.S. at 384; *Cikora v. Dugger*, 840 F.2d 893, 895 (11th Cir. 1988). Only after the defendant meets this burden must the government show the identification was reliable independent of the suggestive procedure. *United States v. Wade*, 388 U.S. 218, 240 & n.31 (1967); *United States v. Sanchez*, 24 F.3d 1259, 1261-62 (10th Cir. 1994); *United States v. Mustafa*, Criminal Action No. 1:11-CR-0234-1-CAP, 2012 WL 1903255, at *2 (N.D. Ga. May 25, 2012).

Henry only complains about, and in any event, the evidence only supports, a conclusion that displaying a single photograph of Henry to the neighbors and CS-1 arguably implicates due process because the procedure was overly suggestive. Courts have concluded that showing a witness only one photograph is unduly suggestive. *See Manson v. Brathwaite*, 432 U.S. 98, 109 (1977) (single photograph of defendant suggestive and unnecessary); *United States v. Cannington*, 729 F.2d 702, 711 (11th Cir.1984); *United States v. Cueto*, 611 F.2d 1056, 1064 (5th Cir. 1980); *see also United States v. Jean*, 315 Fed. Appx. 907, 912 (11th Cir. Feb. 27, 2009).

AO 72A
(Rev.8/82)

Even if the display of the single photograph was unduly suggestive, the identifications nonetheless were reliable and overcame any taint of over-suggestiveness. As to the neighbors on 8th Street, they had multiple opportunities to observe Defendant at that location, so much so that one of them recalled the general type of vehicle he drove. These witnesses lived in close proximity to Scott's residence and thus were close enough to observe Henry. The female witness was very certain of her identification, and stated that Henry occasionally stayed overnight at Scott's residence. While the male witness was less certain of his identification, he also had seen Defendant on more than one occasion. It also is significant that Gordon's manner in seeking these witnesses' cooperation was non-coercive and he asked open-ended questions, thus making any identification by these individuals more reliable and less influenced by an overly suggestive procedure. As a result, the undersigned concludes that these identifications do not offend Henry's Due Process rights.

As for CS-1, he was so certain that Henry was depicted in the photograph that he made the identification before the photograph was even placed on the table in front of him. CS-1 also had prior dealings with Henry, thus minimizing the chance that the identification was tainted by the overly suggestive procedure. Thus, the undersigned concludes that CS-1's identification was not in violation of Henry's Due Process rights.

AO 72A
(Rev.8/82)

The Court notes that as to those identifications made from the collection of photographs, Henry has not satisfied his burden to demonstrate that the manner in which the identifications were made was unduly suggestive.

As a result, as to the two separate identifications that Henry arguably has shown undue suggestiveness, the government has satisfied its burden of showing that the identifications were nonetheless reliable and not in violation of Henry's Due Process rights. Therefore, the undersigned **RECOMMENDS** that the motions to suppress identification testimony, [Docs. 509, 552, 573], be **DENIED**.

### III. *Motion to suppress statements and search at Wingate Inn, Room 125*

After the October 1, 2010, execution of the search warrant at 1855 8th Street, Henry was a fugitive, T157, but shortly before January 23, 2012, information was received that he was in the Tampa, Florida, area, specifically at the Wingate Inn near the University of South Florida. T158. TFO Gordon observed him in a FedEx-Kinko's store across the street from the motel, where law enforcement officers arrested him. T160. In a search incident to his arrest, identification in the name of "Wesley Johnson" was retrieved from Henry's wallet. T160. A cellular telephone also was seized from his person. Because Henry used a cellular phone almost exclusively to facilitate his drug trafficking, Gordon searched it on the scene to verify this was the phone for which

the DEA had obtained a pen register, and also to obtain from the telephone Henry's contacts and missed calls. T164, 177. Gordon testified the cell phone was a Samsung issued through Metro PCS. Gordon testified that he was concerned about, but unsure of, what happened to information on that phone if the battery were removed or lacked power, or whether data on the phone could be remotely erased. T181.

Once Henry was taken out of the store, he complained that the handcuffs were too tight. T166. As Henry was placed in leg irons and a belly chain, with his hands cuffed to the front, T166, he was told that if he ran, he would be Tasered. T208. Henry was asked where he was staying, and he replied room 125 at the Wingate. They placed him in a U.S. Marshal SUV and began transporting him the short distance across the multi-lane road to the motel. T166, 185. Gordon asked him if there were any other persons in his room, or other items that might hurt police, or drugs, and he replied that there were just two pounds of marijuana in a suitcase in the room. T167, 185-86, 198, 204. Gordon told him to wait before he stated anything else, and after they arrived at the motel and while they stood behind the SUV in the motel parking lot, Gordon then read Henry *Miranda* rights from a DEA-13A card. T167-68; Govt. Ex. 3.[11] Henry

---

[11] The form provided:

Before we ask you any questions, you must understand:

23

responded by asking what he needed to do to cooperate. T189. Gordon asked him if he wanted to call Scott, and Henry wanted to know if she was in trouble. T198-99. Gordon replied that she was not, but it had nothing to do with Henry's actions. T200-01, 209.

Numerous officers were involved in the surveillance and arrest and all of them were in plain clothes with some sort of vest with police markings and firearms, but no firearms were drawn. T162, 178. Henry was cooperative and calm. T163,170. He asked for and was allowed to smoke a cigarette. T170. He did not appear under the influence of drugs or alcohol. T171.

---

-You have the right to remain silent.

-Anything you say can be used against you in court.

-You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

-If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand?

Are you willing to answer some questions?

Govt. Ex. 3.

24

Gordon asked him if he consented to a search of the room and Henry verbally agreed to let the officers search his hotel room. T169, 175. Gordon had told Henry that if he did not consent, he would apply for a warrant. T191. Henry replied that he was in enough trouble already in that he already told them the marijuana was in the room, so he agreed to the search. T169. As Gordon read the written DEA consent-to-search form, Govt. Ex. 4, Henry appeared to read along. T171. He was sitting on the stairs of the motel. T172. Henry was asking what kind of sentence he could receive, and Gordon advised him that it was up to the judge, and this was confirmed through a telephone conversation with the AUSA in charge of the case. T171. He signed the form, but because his signature was illegible, Gordon asked him to print his name, and after a conversation about which name he should put on the form (his real name or the alias he used to register at the motel), he ultimately wrote "Otis." T173. He later wrote "Henry." T193. Gordon gave the go-ahead to other officers to search the room upon Henry's placing his indecipherable signature on the consent to search form. T193.

There were no items in the room bearing Henry's name. T99. However, Henry possessed a magnetic plastic key to that room and told the officers he was staying there. T111. Also, the room was registered in a known alias of Henry, "Wesley Johnson." Def. Ex. 13.

Three issues are presented by the facts surrounding Henry's arrest in Tampa: whether (1) his cell phone was validly searched without a warrant as incident to arrest; (2) his admission about marijuana in his room was obtained in violation of *Miranda*; and (3) the consent to search was voluntary.[12] The Court addresses the issues in turn.

### A.    *Warrantless search of Henry's cell phone*

The Eleventh Circuit to date has not decided whether police may search an arrestee's cell phone incident to a lawful arrest and without a search warrant. *See United States v. Allen*, 416 Fed. Appx. 21, 27 (11th Cir. Jan. 31, 2011) ("It is a fairly difficult question, however, it is also a question that we need not answer today.").

---

[12]    At the evidentiary hearing, the Court concluded that Henry had standing to contest the search of the motel room. T118-19. The Eleventh Circuit has held that an individual has an expectation of privacy in a hotel room for which he uses an alias to register where he has exclusive control over the room and the keys. *United States v. Newbern*, 731 F.2d 744, 748 (11th Cir. 1984); *see also United States v. Cunag*, 386 F.3d 888, 894-95 (9th Cir. 2004) (stating that a person's privacy interest in a fraudulently obtained hotel room is diminished, but not extinguished until the hotel owner takes affirmative acts to evict the occupant). *Cf. United States v. Watson*, 950 F.2d 505, 507 (8th Cir. 1991) (defendant possessed expectation of privacy in house purchased under an alias); *United States v. Savage*, Criminal Action No. 07-550, 2013 WL 271797, at *3 (E.D. Pa. Jan. 24, 2013) (holding that defendant's use of an alias in renting apartment and registering the vehicle did not negate his standing to challenge search).

AO 72A
(Rev.8/82)

The undersigned agrees with the Circuit that this is a difficult question and to prophesize how the Supreme Court or the Eleventh Circuit will rule on this issue is an equally fraught endeavor. The Court recognizes that cell phones today are repositories of far greater information than cell phones of even a few years vintage, and that the purposes and uses of these devices are well broader than items which might traditionally have been the subject of incident-to-arrest searches, such as wallets, purses, diaries and briefcases. That being said, the Court concludes that Gordon's actions in this case - determining whether the phone number was one for which a pen register had been obtained, and scrolling through the contacts list and checking for missed calls - does not offend the search-incident-to-arrest exception to the Fourth Amendment's warrant requirement.

The Supreme Court has consistently allowed a thorough search of an arrestee and the items he possesses at the time of his arrest, because, once a person is lawfully seized and placed under arrest, he has a reduced expectation of privacy in his person. *See, e.g., United States v. Robinson*, 414 U.S. 218, 233-24 (1973) (upholding search of closed cigarette package on arrestee's person); *see also United States v. Richardson*, 764 F.2d 1514 (11th Cir. 1985) (search of wallet and papers found on defendant's person validly seized in search incident to arrest). Significant to this Court is the

27

Supreme Court's pronouncement in *Robinson* that a showing of necessity, either for officer safety or destruction of evidence, is not required to justify an officer's search incident to arrest. *Robinson*, 414 U.S. at 235 (rejecting suggestion that "there must be litigated in each case the issue of whether or not there was present one of the reasons supporting the authority" to conduct a search incident to arrest). The Fourth Amendment "permits warrantless searches incident to custodial arrests, and has traditionally been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and lawfully detained." *United States v. Edwards*, 415 U.S. 800, 802-03 (1974) (citing *Robinson*, 414 U.S. 218; *Chimel v. California*, 395 U.S. 752, 755 (1969); and *Weeks v. United States*, 232 U.S. 383, 392 (1914)). This exception to the warrant requirement allows police to remove any weapons that might pose a danger to officer safety and to prevent the concealment or destruction of evidence. *Chimel*, 395 U.S. at 763.

In the present case, the Court agrees with those courts that have concluded that an arrestee's cell phone properly may be searched without a warrant as incident to his lawful arrest for drug trafficking. *United States v. Rodriguez*, 702 F.3d 206, 209-10 (5th Cir. 2012) (relying on *United States v. Finley*, 477 F.3d 250, 259-60 (5th Cir. 2007) (cell phone properly searched without a warrant pursuant to defendant's arrest)); *Silvan*

28

*W. v. Briggs*, 309 Fed. Appx. 216, 225 (10th Cir. Jan. 23, 2009) (holding that "the permissible scope of a search incident to arrest includes the contents of a cell phone found on the arrestee's person") (citing *Finley*, 477 F.3d at 260); *United States v. Mendoza*, 421 F.3d 663, 668 (8th Cir. 2005); *United States v. Murphy*, 552 F.3d 405, 410-12 (4th Cir. 2009) (upholding search of cell phone as incident to arrest); *United States v. Ortiz*, 84 F.3d 977, 982-84 (7th Cir. 1996) (officers were authorized to seize pursuant to arrest a suspected heroin supplier's pager and wristwatch containing an electronic telephone directory in order to preserve evidence, since the pager's electronic memory was finite or could easily be destroyed or lost); *United States v. Gomez*, 807 F. Supp. 2d 1134, 1149 (S.D. Fla. 2011) (holding that "the immediate search at the scene of the cell phone's call log history, limited to phone calls from the preceding 24-48 hours, in our view, was reasonable and appropriate under Supreme Court and Eleventh Circuit precedent"); *see also United States v. McCray*, No. CR408-231, 2009 WL 29607, at * 3 (S.D. Ga. Jan. 3, 2009) (collecting cases). *Cf. United States v. Quintana*, 594 F. Supp. 2d 1291, 1299-1300 (M.D. Fla. 2009) (suppressing search of cell phone's digital photo album incident to arrest for driving while license suspended)

These cases support a conclusion that the limited search of Henry's cell phone, which was removed from his person at the time of his arrest and was virtually

AO 72A
(Rev.8/82)

contemporaneous with his arrest, was lawful.[13]   For the above reasons, the searching of Defendant's cell phone without a warrant in the manner described at the evidentiary hearing was lawful.

### B.    *Henry's post-arrest, pre-***Miranda** *statements*

The Court agrees with Henry that Gordon's question "[D]o you have any guns, weapons -- or *drugs*, weapons, knives, bazookas, or atomic bombs, or any small animals that might hurt me or anything else that might hurt me in the room," T204 (emphasis added), prior to advising Henry of his *Miranda* rights, did not fall within the public-safety exception announced in *New York v. Quarles*, 467 U.S. 649 (1984).

The question in this case was not the broad question asked approvingly in *United States v. Newton*, 369 F.3d 659, 663-64 (2d Cir. 2004) (holding that asking parolee whether he had any "contraband" in the house was not outside public safety exception because "public safety questions are framed spontaneously in dangerous situations

---

[13]    The Court concludes that the search was permitted independent of any exigency that the data on the phone might be lost or compromised (which evidence in any event was generic and not specific to the facts of this case), or probable cause to believe that incriminating evidence would be located on the phone (although probable cause existed since Henry used a cell phone to communicate with others in his drug trafficking and was a fugitive from drug charges).  The Court also does not reach the propriety of any subsequent warrantless search of the phone less proximate in time to Defendant's arrest, or a more extensive search, such as for the content of emails, texts, notes, photographs, passwords maintained or websites visited or stored.

[and p]recision crafting cannot be expected in such circumstances," particularly where parolee disclosed he had a gun and thus understood question to refer to safety-challenging items); *United States v. Reyes*, 353 F.3d 148, 150, 154 (2d Cir. 2003) ("anything on him that [could] hurt [the officer] or anyone on [the] field team"), even though it prompted the defendant to disclose his possession of a packet of drugs as well as a firearm, or the one approved in *United States v. Williams*, 181 F.3d 945, 953 (8th Cir. 1999) (where defendant was asked "is there anything we need to be aware of?"—which prompted defendant to offer a response clearly related to public safety, namely, that he had a gun in a closet).

Instead, the question was similar to the one asked in *United States v. Thomas*, 77 Fed. Appx. 673, 675 (4th Cir. Oct. 14, 2003). There, the police, after arresting the defendant, also were executing a document search warrant on the defendant's apartment and asked him, without benefit of *Miranda* rights, whether he had any drugs or weapons. The defendant directed the officers to a gun in a jacket and 740 grams of cocaine in a bag on a chair. The Fourth Circuit found the gun was admissible under the public safety exception, but that the drugs were admissible under the inevitable discovery doctrine of *Nix v. Williams*, 467 U.S. 431 (1984).

31

The Court recognizes that in *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994), the court found the defendant's statement admissible under public safety exception where, prior to administering *Miranda* warnings, the officer asked defendant before searching him whether defendant had any drugs or needles on his person. The officer in *Carrillo* asked his question as a matter of policy before searching a prisoner to avoid contact with syringes and toxic substances. *Id.* Like the *Carrillo* officer, TFO Gordon in this case asked the question as a matter of policy.

In addition to *Carrillo* not being binding on this Court, other factors distinguish that case from the present one. First, in *Carrillo*, the question was asked before the defendant was searched, whereas here, the question was asked about a location across the street from the place of the defendant's arrest. In searching an arrestee's person, an officer faces a risk when reaching into enclosed pockets, etc. While the Court does not minimize the potential risk to law enforcement when searching a location in which controlled substances may be hidden, the risk is not the same as having to search the person of an arrestee. Second, there was evidence in *Carrillo* that during past searches the officer had been poked by needles and suffered headaches and skin irritation from contact with illegal drugs. *Id.* at 1049 n.1. No such evidence was adduced in this case. Third, *Quarles* prohibits "questions designed solely to elicit testimonial evidence from

32

a suspect." *Quarles*, 467 U.S. at 658-59. Thus, to fall within the exception, a question must have some rational relationship to defusing the perceived danger. *Newton*, 369 F.3d at 679 n.8. In this case, TFO Gordon initially did not mention drugs when he was asked what his standard question to suspects was: "I ask the same thing to everybody. Are there any guns, weapons, knives, bazookas, atomic bombs, or small animals, or anything else that might hurt me in the room?" T167; *but see* T204, 210-11. As a result, the Court concludes that Gordon did not have a safety concern over the presence of drugs.

Finally, the Court is cognizant of the safety concern raised by the government of controlled substances left in a hotel room. However, as to this contention, the Court finds the rationale of the Fifth Circuit instructive:

> The public safety exception archetypically applies in those situations in which law enforcement is confronted with an on-going conflict, arrest, or other volatile situation.[ ] It does not apply, however, when law enforcement is simply aware of or believes that contraband may be located in a particular location to which the public does not have access, such as a vehicle or, arguably, a motel room.[ ]

*United States v. Green*, 388 Fed. Appx. 375, 379 (5th Cir. July 1, 2010). As a result, the Court concludes that the public safety exception does not prevent the suppression of Defendant's unwarned admission that he had marijuana in his motel room

33

Therefore, the undersigned **RECOMMENDS** that the District Court **SUPPRESS** from Henry's trial his pre-*Miranda* statement that he had marijuana stored in his hotel room.

On the other hand, Henry makes no additional claim that his post-*Miranda* statements were unlawfully obtained. [*See* Doc. 671, *passim*]. It is evident from the record that Henry was properly *Mirandized*, he voluntarily waived those rights, and that his subsequent statements were voluntarily obtained. Therefore, to the extent Henry challenges his post-*Miranda* statements, the undersigned **RECOMMENDS** that any challenge be **DENIED**. Thus, the undersigned **RECOMMENDS** that Henry's motion to suppress his post-arrest statements, [Doc. 507], be **GRANTED IN PART AND DENIED IN PART**.

### C. Consent to search Room 125 at the Wingate Motel

At the conclusion of the evidentiary hearing, the Court directed the parties to file opening briefs as to those issues upon which the party had the burden of proof, which included a discussion of the government's burden to demonstrate that the hotel room was searched pursuant to voluntary consent. T212-13. While listing the issues for the government to brief, the Court inadvertently did not mention the consent search of the hotel room, T213. However, even though the government had the burden of proof as

34

to the consent to search the motel room, the government did not make any arguments as to the voluntariness of the consent to search in its post-evidentiary hearing brief, [*see* Doc. 629 *passim*], although it did set out what it contended were the relevant facts, [*id.* at 9-10]. Nor did the government file a reply to Henry's brief in which he argued that the consent was not voluntary. [*See* Doc. 671 at 26].

Rather than declare that the government has forfeited this issue by failing to argue it in its post-evidentiary hearing brief, given the ambiguity of the Court's directions, and the preference for completely addressing all issues on the merits for the District Judge, the Court **ORDERS** the government to file a brief on this issue within **ten (10) days** of the entry of this Order and R&R. Defendant may file a reply brief within **seven (7) days** following the government's filing. The Court's R&R on Henry's motion to suppress, [Doc. 508], relating to the search of the motel room shall be **HELD IN ABEYANCE** pending the receipt of additional briefing.

## IV.    *Conclusion*

For the reasons stated above, the undersigned **RECOMMENDS** that Defendant Henry's motions to suppress evidence from 1855 8th Street, Chamblee, Georgia, [Docs. 513, 521], and identifications, [Docs. 509, 552, and 573], be **DENIED**; his motion to suppress statements, [Doc. 507], be **GRANTED IN PART AND DENIED**

AO 72A
(Rev.8/82)

**IN PART**; and the motion to suppress evidence, [Doc. 508], be **DENIED IN PART AND HELD IN ABEYANCE IN PART**, pending the filing of a brief by the government on the propriety of the search of Henry's motel room at the Wingate Inn within **ten (10) days** of the entry of this Order and R&R. Defendant may file a reply brief within **seven (7) days** following the government's filing.

　　**IT IS SO RECOMMENDED and DIRECTED**, this  30th  day of  January ,
2013.

_____
**ALAN J. BAVERMAN**
**UNITED STATES MAGISTRATE JUDGE**

AO 72A
(Rev.8/82)