IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | **CRIMINAL ACTION FILE** |
| v. | ) | |
| | ) | **NO. 1:10-CR-521-TCB-AJB-02** |
| **OTIS HENRY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### UNITED STATES MAGISTRATE JUDGE'S
### FINAL REPORT AND RECOMMENDATION

In my previous Report and Recommendation, I noted that at the evidentiary hearing, I inadvertently had failed to list as a topic to be briefed by the government the issues related to Henry's consent to search Room 125 of the Wingate Inn in Tampa, Florida, on January 23, 2012. [Doc. 699 at 35]. Thus, the government was directed to file a brief. [*Id.*]. The government has since filed a brief, [Doc. 708], and Henry has responded. [Doc. 738]. After consideration of the record and the parties' briefs (including Henry's initial arguments on the issues), I **RECOMMEND** that Henry's motion to suppress related to the search of Room 125 at the Wingate Inn, [Doc. 508], be **DENIED**.

AO 72A
(Rev.8/82)

**Facts**

These are the facts I found from the evidentiary hearing and set out in the earlier R&R, with additional references to the record. After the October 1, 2010, execution of a search warrant at 1855 8th Street, Chamblee, Georgia, Henry was a fugitive. [Doc. 587 (hereinafter "T__") at 157]. Shortly before January 23, 2012, federal law enforcement agents received information that Henry was in the Tampa, Florida, area, specifically at the Wingate Inn near the University of South Florida. T158. DEA Task Force Officer T.K. Gordon saw Henry inside a FedEx-Kinko's store across the street from the motel, and law enforcement officers arrested him. T160. In a search incident to his arrest, identification in the name of "Wesley Johnson" was retrieved from Henry's wallet. T160. A cellular telephone also was seized from his person, which was searched for Henry's contacts and missed calls. T164, 177.

Numerous officers were involved in the surveillance and arrest, and all of them were armed and wearing plain clothes with vests containing police markings. None of the agents drew a firearm during the arrest. T162, 178.

Once Henry was taken out of the store, he complained that the handcuffs were too tight. T166. As Henry was placed in leg irons and a belly chain, with his hands cuffed to the front, T166, he was told by Gordon that if he ran, he would be Tasered.

2

T208. Henry was asked where he was staying, and he replied Room 125 at the Wingate. The agents placed him in a U.S. Marshal SUV and began transporting him the short distance across the multi-lane road to the motel. T166, 185. Gordon asked him if there were any other persons in his room, or other items that might hurt police, or drugs, and he replied that there were just two pounds of marijuana in a suitcase in the room. T167, 185-86, 198, 204.[1] Gordon told him to wait before he said anything else, and after they arrived at the motel and while they stood behind the SUV in the motel parking lot, Gordon read Henry the *Miranda* rights from a DEA-13A card. T167-68; Govt. Ex. 3.[2] Henry responded by asking what he needed to do to cooperate.

---

[1] The District Judge adopted my prior R&R recommending that this statement be excluded from the government's case in chief since it was obtained in violation of Henry's *Miranda* rights. [*See* Doc. 726 at 8].

[2] The form provided:

Before we ask you any questions, you must understand:

-You have the right to remain silent.

-Anything you say can be used against you in court.

-You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

-If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

AO 72A (Rev.8/82)

T189. Gordon asked him if he wanted to call his girlfriend, Sara Scott, and Henry wanted to know if she was in trouble. T198-99.[3] Gordon replied that she was not, but that her situation had nothing to do with Henry's actions. T200-01, 209. Gordon called Sara Scott from his cell phone, and Henry spoke to her and told her he was in custody. T174, 199.

Henry was cooperative and calm. T163,170. He asked for and was allowed to smoke a cigarette, which appeared to further calm him. T170, 172. He did not appear to be under the influence of drugs or alcohol. T171.

Within a few minutes of advising Henry of his *Miranda* rights, Gordon asked him if he would consent to a search of the room, and Henry orally agreed to let the officers search his hotel room. T169, 175, 190. Gordon had told Henry that if he did not consent, he (Gordon) would apply for a warrant. T191. Henry replied that he was in enough trouble already in that he already told them the marijuana was in the room,

---

    Do you understand?

    Are you willing to answer some questions?

Govt. Ex. 3.

    [3] Scott also was the lessee of the Chamblee premises. T17, 18; Def. Exs. 6-8.

4

so he agreed to the search. T169. As Gordon read the written DEA consent-to-search form, Govt. Ex. 4,[4] Henry appeared to read along. T171, 172. Henry was sitting on the stairs of the motel at the time. T172. Henry asked what kind of sentence he could

---

[4]  The Consent to Search form, Gov't Ex. 4, provided as follows:

CONSENT TO SEARCH

1. I HAVE BEEN ASKED TO PERMIT SPECIAL AGENTS OF THE DRUG ENFORCEMENT ADMINISTRATION TO SEARCH: (Describe the person, places or things to be searched.)

   *WINGATE INN Located @ Intersection of*
   *Fowler*
   *Room 125*
   *Tampa, Florida*
   *(3751 E. Fowler, Tampa, FL)*

2. I HAVE NOT BEEN THREATENED, NOR FORCED IN ANY WAY.

3. I FREELY CONSENT TO THIS SEARCH.

   *1/23/12*           *(undecipherable) OTIS HENRY*
   Date                Signature

                Witnesses:   *S/ T.K. Gordon*

                             *(undecipherable)*

Gov't Ex. 4 (handwriting in italics).

5

receive, and Gordon advised him that it was up to the judge; this was confirmed during a conversation over the speaker of Gordon's cell phone that Henry had with the AUSA in charge of the case. T171. Henry signed the form, but because his signature was illegible, Gordon asked him to print his name, and after a conversation about which name he should put on the form (his real name or the alias he used to register at the motel), Henry ultimately wrote "Otis." T173. He later wrote "Henry." T193. Gordon gave the go-ahead to other officers to search the room upon Henry's placing his indecipherable signature on the consent-to-search form. T175, 193.[5] A suitcase with marijuana and approximately $3000 in cash were located in the room. T175. Henry did not revoke his consent at any time that day. T176.

**Contentions of the Parties**

In his initial post-evidentiary hearing brief, [Doc. 671], Henry argues that his consent to search was not voluntary. He contends he was coaxed into admitting that there was marijuana in the room when he was questioned about the room without

---

[5] There were no items in the room bearing Henry's name. T99. However, Henry possessed a magnetic plastic key to that room and told the officers he was staying there. T111. Also, the room was registered in a known alias of Henry, "Wesley Johnson." Def. Ex. 13. In the previous R&R, I concluded that these facts gave Henry a sufficient legitimate expectation of privacy to challenge the search of the motel room. [Doc. 699 at 26 n.12].

6

benefit of *Miranda* warnings. [*Id.* at 27]. He further contends that after admitting this fact, he was told by Gordon that agents inevitably would search the room and that his signature on the form was a mere formality, since once Henry admitted to the presence of marijuana in the room, Gordon believed he would get a warrant if Henry did not sign the form in his true name. [*Id.*]. Henry also alleges that the discussion of his potential cooperation diminished the voluntariness of any consent because even without expressed promises, "the circumstances nevertheless implied that Henry would fare better if he allowed the officers to search." [*Id.*]. Henry contends that the pressure he felt was demonstrated by his printing of his true name on the form although the evidence shows he did not want to, and as a result of the "trickery, coercion and inherent pressure associated with Gordon's acquisition of consent," any consent was involuntarily obtained. [*Id.* at 27-28].

The government contends in its response that Henry's consent was freely and voluntarily given and was not the product of the trickery, coercion, and inherent pressure, as Henry alleges. [Doc. 708 at 6]. Although Henry was in custody and his admission that marijuana was secreted in the room was obtained before he was read his *Miranda* rights, the government contends that this statement was not coaxed out of him and was immediately followed by Gordon's admonition not to say anything else until

7

he was read his rights. [*Id.* (citing T167)]. The government further claims that Henry's statement that he already was in enough trouble and did not want to make things worse is a neutral factor that does not point to a conclusion of involuntariness. [*Id.*].

The government then contends that all of the other factors weigh in favor of voluntary consent. It argues that Henry had sufficient education in that he appeared to follow along with Gordon as Gordon read the consent-to-search form to him. He also was cooperative, asked about cooperating with authorities as soon as he was read his *Miranda* rights, and discussed cooperating with the AUSA. [*Id.* at 9]. In addition, the agents attempted to make Henry more comfortable by adjusting his restraints, removing him from public view, and allowing him to smoke a cigarette. [*Id.*]. The government also notes that Henry was advised that he did not have to talk and that he was allowed to speak with his girlfriend. [*Id.*]. It argues that Henry's hesitancy in signing his name was not a result of his unwillingness to consent, but rather due to confusion over which name he should use. [*Id.* at 9-10].

In reply, Henry argues that his consent to search was unlawfully tainted by the earlier *Miranda* violation in which he admitted that he had marijuana stored in his hotel room. He analogizes the present case to cases where a Fourth Amendment violation was found to taint a subsequent consent to search, [Doc. 738 at 10-13 (citing *United*

8

*States v. Santa*, 236 F.3d 662, 676-77 (11th Cir. 2000); *Brown v. Illinois*, 422 U.S. 590, 591-96, 597 (1975))]. He contends that Gordon's un-*Mirandized* questioning as to where he was staying and whether he had any contraband in the room "strongly smacks of deliberateness," [Doc. 738 at 13 (citing *United States v. Seibert*, 542 U.S. 600 (2004))], because, he contends, once Henry was arrested, Gordon's mission was completed but his true goal was to search the hotel room. Henry argues that is why he was transported back to the hotel instead of to the federal courthouse and was asked pre-*Miranda* questions about the contents of his hotel room.[6] [*Id.*]. Henry also faults Gordon for imbedding the question about drugs into a question about items that may harm officers entering his hotel room. [*Id.* at 13-14].

Henry then claims that (1) having admitted to possessing marijuana in an un-*Mirandized* statement; (2) being *Mirandized* without being advised that his prior statement was improperly obtained; (3) then discussing the benefits of his cooperation without the specific benefits of cooperation being disclosed; (4) then being asked to consent to search; and (5) Gordon telling him it did not matter whether he signed the form or not because the agents would apply for a search warrant, vitiated any incentive

---

[6] Gordon testified that he asked this question of all arrestees. [*See* Doc. 738 at 13].

9

on Henry's part to avoid incrimination through the seizure of marijuana from the room, and thus the consent was not voluntary. [*Id.* at 14-15].

**Discussion**

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989); *see also United States v. Watson*, 423 U.S. 411, 424 (1976) (describing inquiry as whether person's consent was "his own 'essentially free and unconstrained choice' " or was his " 'will . . . overborne and his capacity for self-determination critically impaired.") (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)). In considering whether a consent to search was voluntary, the Court must examine the totality of the circumstances. *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004); *United States v. Tovar-Rico,* 61 F.3d 1529, 1535 (11th Cir. 1995); *see also United States v. Gonzalez*, 71 F.3d 819, 828-32 (11th Cir. 1996), *overruled on other grounds by Arizona v. Gant*, 556 U.S. 332 (2009) (illustrating factors properly to be considered in totality-of-the-circumstances inquiry). Further, "'[t]he government bears the burden of proving . . . that the consent was not a function of acquiescence to a claim of lawful authority but rather was given freely and voluntarily.' " *United States v. Hidalgo*, 7 F.3d 1566, 1571 (11th Cir. 1993) (quoting

10

*United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989)).  The absence of official coercion is a *sine qua non* of effective consent, as it is axiomatic that "[w]here there is coercion, there cannot be consent."  *Gonzalez*, 71 F.3d at 828 (quoting *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968)); *see also Florida v. Bostick,* 501 U.S. 429, 438 (1991) (" 'Consent' that is the product of official intimidation . . . is not consent at all.").

The Eleventh Circuit has, on prior occasions, identified a non-exhaustive list of relevant factors to consider when making the assessment of whether consent to a warrantless search is voluntary: voluntariness of the defendant's custodial status, the presence of coercive police procedures, the extent and level of the defendant's cooperation with police, the defendant's awareness of his right to refuse to consent to the search, the defendant's education and intelligence, and, significantly, the defendant's belief that no incriminating evidence will be found.  *Blake*, 888 F.2d at 798-99; *see also United States v. Mendenhall*, 446 U.S. 544, 557 (1980) (holding that whether consent was "in fact voluntary or a product of express or implied duress or coercion is to be determined by the totality of the circumstances").  However, the failure to advise the defendant of his right to refuse to consent will not invalidate

11

an otherwise valid consent to search. *United States v. Pineiro*, 389 F.3d 1359, 1366 n.4 (11th Cir. 2004); *United States v. Zapata*, 180 F.3d 1237, 1242 (11th Cir. 1999).

First, although Henry was in custody, a degree of duress is present in any arrest. The question is whether the officers used coercive tactics or took unlawful advantage of the arrest situation to obtain the consent. *United States v. Jones*, 475 F.2d 723, 730 (5th Cir. 1973)[7]; *see also United States v. Smith*, 199 Fed. Appx. 759, 763 (11th Cir. Sept. 15, 2006) (quoting *Jones*, *id.*). While following the arrest Gordon advised Henry that if he ran while they switched out the handcuffs, he would be Tasered, this statement was unrelated to any request for consent to search and before Henry and the agents left the scene of arrest. Following his arrest, Henry was transported to the motel, *Mirandized*, allowed to sit outside the vehicle and smoke a cigarette, speak with his girlfriend, and discuss cooperation with Gordon and the AUSA. In short, there is no evidence that the Taser statement coerced Henry into consenting to a search of his motel room or overbore his will to refuse the request to consent.

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Second, the evidence shows that Henry was cooperative with the police, and as noted in the preceding paragraph, had conversations with Gordon and the AUSA about cooperating with their investigation.

Third, although the record does not contain any information about Henry's education and intellectual functioning, there was no dispute that he appeared to read along with Gordon while being read the consent-to-search form.

Fourth, Henry was not told that he had a right to refuse consent, so this factor, although not determinative, points towards a finding of involuntariness.

Fifth, obviously this is not a case where the suspect did not believe that the police could locate any contraband in his motel room, and thus would be more likely to consent to a search. However, I am unaware of any case that holds that just because a person knows there is evidence of crime on the premises sought to be searched by consent, the consent was found to be involuntary. In this case, this factor is simply not applicable.

As to coercive police procedures, Henry argues that the *Miranda* violation coerced him into consenting because he knew he already had admitted that the marijuana was in his room. I reject this argument. While his admission that there was marijuana in his motel room was obtained without the benefit of *Miranda* warnings and

13

thus is excludable from his trial, the statement was otherwise voluntarily made, and while he might have thought he had no choice to consent, he was not coerced by the agents to consent just because he already told them about the marijuana. A *Miranda* violation does not preclude a voluntary consent to search. In *Hidalgo*, the Eleventh Circuit held that a defendant's consent was voluntary even after he invoked his Fifth Amendment rights against self-incrimination, because consent to search is not an incriminating statement. *Hidalgo*, 7 F.3d at 1568; *see Oregon v. Elstad*, 470 U.S. 298, 307 (1985) ("But the *Miranda* presumption, though irrebuttable for purposes of the prosecution's case in chief, does not require that the statements and their fruits be discarded as inherently tainted."); *see also Dickerson v. United States*, 530 U.S. 428, 441 (2000) (explaining that "unreasonable searches under the Fourth Amendment are different from unwarned interrogation under the Fifth Amendment").

Henry's argument is based upon the incorrect legal assumption that suppression of the marijuana flows directly from the *Miranda* violation. The cases he relies upon concern the Fourth Amendment, and thus are not instructive in determining the remedial scope for a Fifth Amendment violation. On the other hand, *Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement. *United States v. Patane*, 542 U.S. 630, 645 (2004)

14

(Kennedy, J., concurring in the judgment); *United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir. 2007). Henry makes no argument, nor does the evidence support a conclusion, that the unwarned statement was not voluntarily obtained, as opposed to being acquired only in violation of *Miranda*.[8] Moreover, even if Gordon's questioning

---

[8] Similar to the considerations involving a consent to search, the focus of inquiry into whether a defendant's statement was obtained voluntarily is on whether the defendant was coerced by the government into making the statement: "The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted). The Court must consider the totality of the circumstances in assessing whether police conduct was "causally related" to the confession. *Miller v. Dugger*, 838 F.2d 1530, 1536 (11th Cir. 1988). This totality-of-the-circumstances test directs the Court ultimately to determine whether a defendant's statement was the product of "an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). Among the factors the Court must consider are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police. *See, e.g., Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Gonzalez*, 71 F.3d at 828. However, while the Eleventh Circuit has "enumerated a number of (non-exclusive) factors that may bear on the issue of voluntariness, the absence of official coercion is a *sine qua non* of effective consent . . . ." *Gonzalez*, 71 F.3d at 828 (citations omitted). Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession. *See Connelly*, 479 U.S. at 163 n.1; *Miller*, 838 F.2d at 1536; *United States v. Castaneda-Castaneda*, 729 F.2d 1360, 1362-63 (11th Cir. 1984). Isolated incidents of police deception, *id.*; *Frazier v. Cupp*, 394 U.S. 731, 739 (1969); and discussions of realistic penalties for cooperative and non-cooperative defendants, *see United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992); *United States v. Nash*, 910 F.2d 749, 753 (11th Cir. 1990), are normally insufficient to preclude free choice.

15

without first advising Henry of his *Miranda* rights was a deliberate tactic (although I conclude that it was not), a *Seibert* violation only makes the subsequent but warned statement inadmissible, but does not result in suppression of the physical fruits of the otherwise voluntary statement. *Jackson*, 506 F.3d at 1361 ("*Seibert* held inadmissible a statement obtained by interrogation techniques calculated to undermine *Miranda* warnings. [*Seibert*, 542 U.S. at 617 [ ] (plurality opinion). *Patane* held that no violation of an obligation to warn that produces a voluntary statement is severe enough that the deterrence value of suppression outweighs 'the important probative value of reliable physical evidence.' *Patane*, 542 U.S. at 645 [ ] (Kennedy, J., concurring in the judgment)."). Therefore, Henry's unwarned statement obtained in violation of *Miranda* did not taint his subsequent voluntary consent to a search of his motel room.

---

In this case, the statement about marijuana in the room was voluntary because it was obtained only a few minutes after Henry was arrested; he had not been questioned; while in custody his comfort had been attended to by the changing of the handcuffs; and he had not been promised any benefit. The Court recognizes that Gordon advised Henry that if he ran while they switched out the handcuffs, he would be Tasered, but the Court concludes that this statement was unrelated to any statements, was made before Henry and the agents left the scene of arrest (while the statement about the marijuana appears to have been made while inside the Marshal's SUV), and there is no evidence that the atmosphere between Henry and the agents, while obviously not pleasant to Henry, was coercive.

16

Further, Henry's consent to search was not rendered involuntary by Gordon's statement that if Henry did not consent Gordon would apply for a warrant. Even if Gordon had stated that he would get a warrant if Henry did not consent, this would not render his consent involuntary; that the police inform a party that they will obtain a warrant if the party does not consent to a search does not amount to coercion. *Garcia*, 890 F.2d at 361; *see also United States v. Racca*, 255 Fed. Appx. 367, 369 (11th Cir. Oct. 18, 2007) (same); *United States v. Villanueva-Fabela*, 202 Fed. Appx. 421, 427-28 (11th Cir. Oct. 27, 2006) (same, and explaining difference between *Garcia*, where agents merely stated they would obtain a search warrant and consent was found voluntary, and *Bumper v. North Carolina*, 391 U.S. 543, 548-50 (1968), where police coerced consent by falsely stating that they already had a search warrant, and consent was deemed involuntary because it was obtained by mere acquiescence to a claim of lawful authority).

Next, while Henry argues that he felt he had no choice but to consent because he already told the officers about the marijuana,[9] the record does not support a finding that the officers in any way expressed or implied that he had no choice but to consent. And

---

[9] Gordon testified that "right after the consent, right after I asked him for consent, that's when he said, you know, I already told you I'm already in enough trouble. I'm already in enough trouble." T169.

17

while Henry's subjective beliefs are relevant to the totality of the circumstances to be considered, *Schneckloth*, 412 U.S. at 229 ("In examining all the surrounding circumstances to determine if in fact the consent to search was coerced, account must be taken of subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."), the critical issue still is official coercion. *Id.*; *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003). There was none in this case.

Moreover, although Henry tries to link the two, there is no evidence that he was advised that consenting to a search of the motel would assist him in his efforts to cooperate or that his consent was a condition of his being allowed to cooperate.

Finally, although the record is not particularly clear as to how Henry came to ultimately print his name on the consent form, it is clear that he verbally consented and consented in writing using an illegible signature prior to affixing his printed name on the consent to search form.

As a result, I find that Henry voluntarily consented to the search of his room at the Wingate Inn. Therefore, I **RECOMMEND** that his motion to suppress the fruits of that search be **DENIED**.

**Conclusion**

For all the reasons stated above, it is **RECOMMENDED** that Otis Henry's motion to suppress the fruits of the search of his Room 125 at the Wingate Inn in Tampa, Florida, as he seeks in his motion to suppress, [Doc. 508], be **DENIED**. Moreover, since there are no other matters pending before me, the Clerk is **DIRECTED** to **CERTIFY** this case **READY FOR TRIAL**.

IT IS SO RECOMMENDED AND CERTIFIED, this the  6th  day of June, 2013.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

AO 72A (Rev.8/82)